UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DAVID KUTZER,                    :
                                 :
        Plaintiff               :     No. 3:13-CV-01774
                                 :
   vs.                           :     (Judge Kane)
                                 :
CAROLYN W. COLVIN, ACTING        :
COMMISSIONER OF SOCIAL           :
SECURITY,                        :
                                 :
        Defendant               :

**MEMORANDUM**

**Background**

        The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff David Kutzer's claim for social security
disability insurance benefits and supplemental security income
benefits.

        Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  It is
undisputed that Kutzer met the insured status requirements of the
Social Security Act through December 31, 2013. Tr. 37, 81-82, 144
and 208.[1]

_____

1.  References to "Tr.___" are to pages of the administrative
record filed by the Defendant on August 30, 2013.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.

On June 14, 2010, Kutzer protectively filed[2] his applications for disability insurance benefits and supplemental security income benefits. Tr. 37, 74-75, 80, 126-135 and 137-144. On February 4, 2011, the applications were initially denied by the Bureau of Disability Determination.[3] Tr. 80 and 95-103. On April 7, 2011, Kutzer requested a hearing before an administrative law judge. Tr. 80 and 105. After about 9 months had passed, a hearing was held on January 5, 2012.  Tr. 35-73.  Kutzer was represented by counsel at the hearing. Id.  On January 30, 2012, the administrative law judge issued a decision denying Kutzer's applications. Tr. 80-90.  As will be explained in more detail infra the administrative law judge found that Kutzer had the capacity to perform work at all physical exertional levels but with several nonexertional limitations and found that Kutzer could perform prior relevant employment as a packer and also in the

---

2.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 95 and 100.

alternative identified three additional positions that Kutzer could perform: a groundskeeper, a picker/packer/sorter and an inspector of small products. Tr. 69-71, 84 and 90.  The vocational expert described all of these positions as unskilled work. Tr. 71. He also identified the exertional level of the groundskeeper position as medium duty, the picker/packer/sorter as light duty, and the inspector of small products as sedentary duty.[4]  Tr. 71.

---

4.  The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(continued...)

3

On March 19, 2012, Kutzer filed a request for review with the Appeals Council and after over 14 months had elapsed the Appeals Council on May 31, 2013, concluded that there was no basis upon which to grant Kutzer's request for review. Tr. 1-5 and 15-16. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Kutzer then filed a complaint in this court on June 26, 2013.  Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on December 30, 2013, when Kutzer filed a reply brief.

Kutzer was born in the United States on December 14, 1970, and at all times relevant to this matter was considered a "younger individual"[6] whose age would not seriously impact his

---

4.   (...continued)
>    (d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.
>
>    (e) *Very heavy work*. Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

2 C.F.R. §§ 404.1567 and 416.967.

5.   Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

6.   The Social Security regulations state that "[t]he term
(continued...)

4

ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). Tr. 47 and 137.

Although Kutzer attended special education classes because of dyslexia, he graduated from high school in 1989 and can read, write, speak and understand the English language and perform basic mathematical functions such as counting change. Tr. 44-46, 178 and 268.  After graduating from high school, Kutzer did not complete "any type of special job training, trade or vocational school." Tr. 189.  Kutzer has an extensive history of drug and alcohol abuse including at times when he was employed. Tr. 47-49. The record reveals that Kutzer has three convictions for driving under the influence and has used marijuana, cocaine, crack, heroin, LSD, mushrooms, and ecstasy. Tr. 47-49 and 265. The DUI convictions occurred in 1993, 1998 and 2004. Tr. 264.  He also had a parole violation relating to the 2004 DUI conviction. Id.  At the administrative hearing on January 5, 2012, Kutzer initially testified that he had not used drugs for 10 to 11 years but subsequently upon questioning by the administrative law judge admitted that he had used cocaine in 2006. Tr. 49. The record also reveals that he used marijuana in June 2008. Tr. 302.

Kutzer's work history covers 24 years and at least 8 different employers. Tr. 145, 153-155 and 193.  The records of the

---

6.  (...continued)
younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). At the time of the administrative hearing Kutzer was 41 years of age. Tr. 43.

Social Security Administration reveal that Kutzer had earnings in the years 1987 through 2010. Tr. 145.  Kutzer's annual earnings range from a low of $781.32 in 2010 to a high of $28,979.90 in 2003. Id.  Kutzer's total earnings during those 24 years were $203,161.60. Id.

In documents filed with the Social Security Administration Kutzer reported that he worked as a bus cleaner from November, 1993 to November 1995 (8 hours per day, 5 days per week); as a machine operator from January, 1996, to May, 1998 (8 hours per day, 5 days per week); as a laborer assembling cabinets from April, 1998, to March, 2004 (8 hours per day, 5 days per week); as an assembler at a truck manufacturing plant from January, 2006 to April, 2006 (10 hours per day, 4 days per week); and as a laborer/assembler at a manufacturer of bay doors from June, 2006 to September, 2007 (8 hours per day, 5 days per week). Tr. 193-198.  Kutzer further reported that he worked from October 2, 2007, to February 15, 2008, as a packer at a warehouse (6 hours per day 5 days per week)and from July 7, 2009 to October 4, 2009, as a packer/machine operator at a factory that made cups (8 hours per day, 5 days per week).  Tr. 180, 193 and 212.  He also reported that from October, 2009 to November, 2009, he worked as an assembler for a window company and during September, 2010, as a packer at a book company both positions having been obtained through a temporary employment agency. Tr. 193.

6

Kutzer has past relevant employment[7] as (1) a packer which was described by a vocational expert as unskilled, medium work; (2) an assembler of trucks which was described as unskilled, medium work, (3) a laborer in the sheet metal industry described as semi-skilled, medium work as generally performed in the economy and heavy work as actually performed by Kutzer; (4) a laborer for a cabinet manufacturer described as unskilled, medium work; and (5) a machine operator described as semi-skilled, medium work. Tr. 67. Kutzer's last three positions were combined by the vocational expert into one and described as the unskilled, medium work as a packer. Tr. 67.

Kutzer initially claimed that he became disabled on September 2, 2007, because of anxiety, depression and anger problems. Tr. 135, 137 and 179. On that date he lost his job "because of anger problems/anxiety." Tr. 174. At the administrative hearing Kutzer alleged that he suffered from generalized anxiety disorder with panic attacks and agoraphobia,[8]

---

7. Past relevant employment in the present case means work performed by Draina during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

8. According to the National Institute of Health's website

> Panic disorder with agoraphobia is an anxiety disorder in which a person has attacks of intense fear and anxiety. There is also a fear of being in places where it is hard to escape, or where help might not be available. Agoraphobia usually involves fear of crowds, bridges or of being outside alone.

(continued...)

bipolar disorder and a learning disorder. Tr. 40.  Kutzer did not allege that he suffered from any physical impairments which would prevent him from engaging in substantial gainful employment. Tr. 42.  Kutzer at the administrative hearing also amended his alleged disability onset date to March 1, 2010. Tr. 72 and 80.  Kutzer's father died of cancer on February 25, 2010, and he claims that his mental condition deteriorated on March 1, 2010, as a result of that death. Tr. 49, 72 and 88.  Up until his father's death, Kutzer was caring for his father including giving him his medicine, bathing him and taking him to the bathroom. Tr. 50. At the time of his father's death Kutzer was working for Jacobson Staffing Company, LC, and he quit that position on February, 28, 2010.[9] Tr. 50, 156, 174 and 179.

Although Kutzer has not engaged in any employment since February, 2010, he attempted to obtain employment as well as applied for and received unemployment compensation benefits. Tr. 51-52.  Kutzer testified at the administrative hearing that when he applied for unemployment compensation he certified that he was

_____

8.  (...continued)
Panic disorder with agoraphobia, A.D.A.M. Medical Encyclopedia, PubMed Health, U.S. National Library of Medicine, http://www.nlm.nih.gov/medlineplus/ency/article/000923.htm (Last accessed June 11, 2014).

9.  One record indicates that he quit working for Jacobson Staffing Company on February 22, 2010. Tr. 174.

8

"ready, willing and able to work" but that when he made that statement he was "[n]ot really" able to engage in work.[10] Tr. 52.

As of the date of the administrative hearing, Kutzer had lived by himself for six years. Tr. 43. Kutzer was able to perform his own cooking, cleaning, laundry and shopping. Tr. 44. On a typical day, he would do housework and run errands. Tr. 185. Kutzer was able to perform yard work, including mowing grass and trimming shrubs. Tr. 64. Kutzer spent at least three hours outside each day. Tr. 188. Kutzer was able to drive, and typically drove to the grocery store and medical appointments. Tr. 47. Kutzer shopped in stores for clothing, personal products and food. Tr. 188. Kutzer had no problem with personal care and was able to prepare his own meals. Tr. 186-187. Kutzer took care of a cat, including providing the cat with food and water and cleaning the litter box. Tr. 186.

Kutzer's mother provided a letter to his attorney which was then submitted to the administrative law judge at the administrative hearing. In the letter Kutzer's mother reports on Kutzer's difficulties while attending school, including suffering from dyslexia. Tr. 220-221. She also reports in the letter on his difficulty holding jobs. Id. There is no indication in the letter

---

10. An individual can only collect unemployment compensation if the individual is able and willing to accept work. 43 P.S. §801(d)(1). Although receipt of workers' compensation benefits does not preclude an award of disability insurance or supplement security income benefits, an administrative law judge may consider receipt of such benefits when judging a claimant's credibility.

that Mrs. Kutzer had first-hand knowledge of these difficulties. Instead the manner in which the letter is drafted suggests that the information she reports in the letter was based on conversations she had with her son.  Mrs. Kutzer did not testify at the administrative hearing.

Paula Yellard, a friend of Kutzer since 2000, also provided a letter outlining Kutzer's mental difficulties. Tr. 218-219.  She reported Kutzer's tendency to "shy away from outings or having to be around the public." Tr. 218. She stated that he would become depressed and "easily lose his temper;" and she helps Kutzer with his phone calls and filling out paperwork and "explains his mail or bills to him[.]" Tr. 218-219. She noted that he gets frustrated easily, has a hard time concentrating, following directions and completing tasks and "often forgets things[.]" Tr. 219.

Neither Kutzer's mother nor Ms. Yellard mentioned Kutzer's significant history of drug and alcohol abuse.

For the reasons set forth below we will affirm the Commissioner.

## Standard of Review

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d

857, 858 (3d Cir. 1995).  However, our review of the
Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is
to determine whether those findings are supported by "substantial
evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.
1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).
Factual findings which are supported by substantial evidence must
be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34,
38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported
by substantial evidence, we are bound by those findings, even if
we would have decided the factual inquiry differently."); Cotter
v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by
the Secretary must be accepted as conclusive by a reviewing court
if supported by substantial evidence.");  Keefe v. Shalala, 71
F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176
(4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529
n.11 (11th Cir. 1990).

     Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565
(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197,
229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d
198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360
(3d Cir. 1999).  Substantial evidence has been described as more
than a mere scintilla of evidence but less than a preponderance.

Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[11] (2) has an impairment that is severe or a combination of impairments that is severe,[12] (3) has

---

11.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

12.   The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled"
(continued...)

an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[13] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[14]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and

_____

12. (...continued)
and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

13. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

14. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

14

is defined as eight hours a day, five days per week or other
similar schedule. The residual functional capacity assessment must
include a discussion of the individual's abilities.  Id; 20 C.F.R.
§§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1
("'Residual functional capacity' is defined as that which an
individual is still able to do despite the limitations caused by
his or her impairment(s).").

**Medical Records**

Before we address the administrative law judge's
decision and the arguments of counsel, we will review in detail
Kutzer's medical records. The court will review Kutzer's medical
records which predate his initial alleged disability onset date as
well as his amended disability onset date because those records
reveal that he was working at a time when he suffered mental
conditions similar to those he claims prevented him from working
after the initial and amended disability onset dates.

On January 18, 2007, Kutzer had an appointment with
Michael J. Grasso, M.D., at Intermountain Medical Group, P.C.[15]
Tr. 238-239.  At the appointment Kutzer complained of anxiety and
depression. Tr. 238.  He reported "always worrying about things"
and that he has been "nervous around crowds of people" for a
number of years and that it seemed to be getting worse. Tr. 238.
Kutzer also reported a lack of energy and motivation and that he

--------------------------------

15.  The record does not reveal the location of this medical
practice but an internet search reveals that Dr. Grasso is
located in Wilkes-Barre.

had been treated for depression with Prozac and Paxil.[16] Id.  He
stated that the Prozac caused "jitteriness" but the Paxil "worked
ok." Id.  It was noted by Dr. Grasso that Kutzer had lost his
license because of a DUI conviction and that Kutzer "had been
doing a lot of cocaine" but did not "want that lifestyle anymore."
Tr. 238. The report of this medical appointment sets forth no
mental status examination findings other than Kutzer "display[ed]
comfort and cooperation." Tr. 239.  Dr. Grasso's diagnostic
assessment was that Kutzer suffered from agoraphobia with panic
disorder[17] and he prescribed the psychotropic medications Lexapro,
Zoloft and Effexor.[18] Id.  Kutzer had follow-up appointments with

---

16.  Paxil (generic paroxetine) "is an antidepressant in a group
of drugs called selective serotonin reuptake inhibitors (SSRIs)"
and "is used to treat depression, obsessive-compulsive disorder,
anxiety disorder, posttraumatic stress disorder (PTSD), and
premenstrual dysphoric disorder (PMDD)." Paxil, Drugs.com,
http://www.drugs.com/paxil.html (Last accessed June 11, 2014).
Prozac is also an SSRI antidepressant used to treat major
depressive disorder, obsessive-compulsive disorder and panic
disorder. Prozac, Drugs.com, http://www.drugs.com/prozac.html
(Last accessed June 11, 2014).

17.  Because Kutzer is only alleging a mental disability when
reviewing the medical records the court will only mention
Kutzer's mental conditions reported by the physicians or other
medical or mental health professionals.

18.  Lexapro (generic escitalopram) is an SSRI antidepressant
used to treat major depressive disorder. Lexapro, Drugs.com,
http://www.drugs.com/lexapro.html (Last accessed June 11, 2014).
Zoloft (generic sertraline) is an SSRI antidepressant used to
treat depression, obsessive-compulsive disorder, anxiety
disorder, PTSD, and PMDD. Zoloft, Drugs.com, http://www.drugs.
com/zoloft.html (Last accessed June 11, 2014). Effexor (generic
venlafaxine), an antidepressant, is a selective serotonin and
norepinephrine reuptake inhibitor (SSNRI) used to treat major
depressive disorder, anxiety disorder and panic disorder.
(continued...)

Dr. Grasso on January 30, March 5 and 28, and May 3, 2007. Tr. 232-237.  There were no mental status examination findings recorded other than on January 30th and March 28th when Dr. Grasso reported that Kutzer "display[ed] comfort and cooperation." Id. On January 30 and March 28, 2007, the diagnostic assessment was that Kutzer suffered from agoraphobia with panic disorder and the reports of the appointments on March 5 and May 3, 2007, do not report a mental health diagnostic assessment.  Id.  However, on all four occasions Dr. Grasso prescribed Lexapro. Id.

On October 15, 2007, Kutzer had a psychiatric intake evaluation performed by a Bachelor of Science level clinician[19] at the Community Counseling Services of Northeastern Pennsylvania ("Community Counseling Services"). Tr. 256-272.  Kutzer told the clinician that he had a history of treatment for depression and was taking Lexapro for 6 months which was prescribed by Dr. Grasso but that he had not taken it for 3 weeks because he lost his insurance.  Tr. 256.  Kutzer stated that he felt more depressed, helpless, and hopeless with decreased energy and motivation and poor concentration and attention span; he stated that he was often tearful and anxious on occasion; he had increased irritability, mood swings and often thought people were talking about him; he

18.  (...continued)
Effexor, Drugs. Com, http://www.drugs.com/effexor.html (Last accessed June 11, 2014).

19.  The report of this evaluation is set forth on a form which is filled out in handwriting and the signature of the clinician is illegible.

had poor sleep and racing thoughts and felt very anxious and uncomfortable around people. Tr. 256-257.  Kutzer further stated that he had "taken Xanax he acquired but really had not been taking anything." Id.  Kutzer noted that he had been taking Paxil for 3 years but stated that he did not feel it helped. Tr. 257. Kutzer stated that he presently was looking for medication management by a medical provider. Id.  Kutzer also reported occasional visual hallucinations. Tr. 259  He noted that he would see things moving when he was using drugs and these hallucinations started 5 years ago when he was taking ecstasy. Id. Kutzer denied any suicidal, homicidal, assaultive, or self-mutilation ideas, plan or intent. Tr. 260. Kutzer reported that he started using alcohol and several other drugs when he was a teenager, including cocaine, crack, heroin, and LSD. Tr. 265. Kutzer when asked about any functional limitations or restrictions with respect to sight, speech, hearing, and physical abilities indicated he had none. Tr. 268. He also stated that he had no problems with reading, writing or spelling. Id.

A mental status examination performed by the clinician revealed that Kutzer was neatly groomed and clean and he had a fair rapport; his mood was depressed and anxious; his affect related; his behavior controlled and cooperative; he was oriented to person, place and time with normal speech and average intellect; his thought process was normal; with respect to thought content he was noted to have visual hallucinations and paranoid

18

thoughts; his memory was intact; his insight and judgment fair; he had impulse control; he denied suicidal and homicidal ideas, plan or intent; and his motivation for treatment was good. Tr. 269-270. The clinician's diagnostic assessment was that Kutzer suffered from depressive disorder, not otherwise specified; anxiety disorder, not otherwise specified; and polysubstance dependence, and he was given a Global Assessment of Functioning (GAF) score of 52.[20] The treatment plan was for Kutzer to take the psychotropic

---

20.  The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id.  The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination.  The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two.  Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20.  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas,  such as work or school, family relations, judgment, thinking or mood. Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

medication Celexa[21] and follow-up periodically with the outpatient department. Tr. 271.  On the same day, Pareshkumar C. Solgama, M.D., a psychiatrist, reviewed and approved the diagnosis, including the GAF score of 52, and treatment plan prepared by the clinician. Tr. 255.

On October 29, 2007, Kutzer had a follow-up appointment at Community Counseling Services with a clinician. Tr. 311. Kutzer reported his depression had decreased on the Celexa but he still had anxiety. Id.  He stated that he had panic attacks and became irritable very quickly and that he would suffer stress over little things. Id.  A mental status examination revealed that Kutzer was oriented to person, place and time; his appearance was neat; he reported good sleep and appetite; his thought content was within normal limits and he had no auditory or visual hallucinations, paranoia or delusions; he had no suicidal or homicidal ideas; his mood was depressed and his affect blunted; and he had appropriate insight and judgment and good impulse control. Id.  It was noted that Kutzer was stable and he was prescribed the anti-anxiety medication Buspar.[22] Id.

---

21.  Celexa (generic citalopram) is an SSRI antidepressant. Celexa, Drugs.com, http://www.drugs.com/celexa.html (Last accessed June 11, 2014).

22.  Buspar (generic busipirone) "is an anti-anxiety medicine . . . used to treat symtoms of anxiety, such as fear, tension, irritability, dizziness, pounding heartbeat, and other physical symptoms." Buspar, Drugs.com, http://www.drugs.com/buspar.html (Last accessed June 12, 2014).

Kutzer failed to attend a medical appointment at Community Counseling Services on November 26, 2007. Tr. 367.  At an appointment on November 29, 2007, Kutzer denied that he suffered from depression, hopelessness, helplessness, suicidal or homicidal symptoms, psychotic symptoms, mania, anxiety, sleep problems and appetite problems. Tr. 310. Kutzer reported that he stopped taking Celexa 2 to 3 weeks prior to the appointment because it made him feel more depressed but was still taking the Buspar. Id. Kutzer stated that he no longer felt on edge and had no anxiety but did notice racing thoughts 2 times per week. Id. He further stated that his "depression may have been due to his recent DUI and legal issues." Id.  Although it was reported that Kutzer had a blunted affect, a mental status examination was essentially normal, including Kutzer's mood was euthymic.[23] Id.   A five-week follow-up appointment was scheduled. Id.

The follow-up appointment occurred on January 3, 2008, at which time Kutzer reported no problems. Tr. 309.  It was stated that Kutzer reported feeling well on his medications and that he had less anxiety on the Buspar. Id.  The results of a mental status examination were essentially normal. Id. Oddly, with respect to insight and judgement there was a check mark placed before impaired with no indication on the form as to how his

---

23.  Euthymic is defined as "pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated." Mosby's Medical Dictionary, 8th edition, 2009. http://medical-dictionary.thefreedictionary.com/euthymic (Last accessed June 13, 2014).

judgment and insight were impaired. However, Kutzer's orientation, appearance, sleep, appetite, thought content, speech, mood, affect and impulse control were all noted to be normal. Tr. 309.  It was also stated that he had no suicidal or homicidal symptoms. Id. Kutzer was continued on medications and a follow-up appointment scheduled. Id.  Similar mental status findings were made at appointments on January 31 and March 13 and 27, 2008, except at the latter two appointments Kutzer reported depression. Tr. 308. Furthermore, with respect to insight and judgment at those three appointments check marks were placed on the forms before the word "present" instead of impaired. Id.  Kutzer was continued on the medication Buspar and he was also prescribed the psychotropic medication Paxil. Tr. 277 and 308.  On April 24, 2008, Kutzer "chose not to attend" an appointment. Tr. 366.

On May 12, 2008, Kutzer had an appointment with a therapist at Community Counseling Services. Tr. 366.  The therapist described Kutzer's mood and affect as pleasant and full; his behavior and appearance as cooperative and neat; and his thought flow and content as alert and oriented to person, place and time and clear. Id.  Kutzer had no suicidal or homicidal ideas and his insight and judgment were intact. Id.  Kutzer denied depression and anxiety and reported that he was doing well. Id. He denied mood changes, drug and alcohol use, auditory and visual hallucinations and delusions. Id.  He denied appetite changes but reported that he only sleeps 4 to 5 hours per night. Id.  Kutzer

22

was continued on the medications Buspar and Paxil. Tr. 277 and
366.

Kutzer's next appointment at Community Counseling
Services was on June 20, 2008, and, notably, on that date there
was a significant change reported in Kutzer's behavior and mental
condition. Tr. 302.  It was reported that Kutzer was smoking
marijuana occasionally, and allegedly the last time was two weeks
prior to the appointment. Id.  Kutzer complained of depression,
hopelessness and helplessness at times, and anxiety and sleep
problems. Id.  He reported sleeping about 4 hours per night,
feeling lethargic and unmotivated, having a high anxiety level, "a
little bit" of depression and a low energy level during the day.
Id. He stated that he feels people talk about him, he loses his
temper and feels like hurting people at times and sometimes he has
visual hallucinations, i.e., flashes of light. Id. A mental status
examination revealed that Kutzer had a depressed, anxious,
irritable and agitated mood and impaired insight and judgment. Id.
Kutzer was continued on the same medications. Id.

At the next appointment with a therapist at Community
Counseling Service on July 18, 2008, Kutzer's behavior and mental
condition were improved.  Tr. 365.  Kutzer's mood and affect were
described as pleasant and full; his behavior and appearance as
cooperative and neat; he was described as alert and oriented to
person, place and time with clear thought content; and his insight
and judgment were intact. Id.  Kutzer denied depression, anxiety,

mood swings, drug and alcohol use, and auditory and visual
hallucinations and delusions. Id.  Kutzer reported that his sleep
was "ok" and his appetite good. Id.  Kutzer requested that he only
take the Buspar twice per day because it sometimes makes him
tired. Id.  Kutzer was continued on the medications as prescribed
but the dosage of Buspar was decreased. Id.

Kutzer had therapy appointments at Community Counseling
Services on August 14 and September 12, 2008. Tr. 364-365.  At
those appointments there were no significant changes in Kutzer's
behavior or mental status. Id.  On August 14, 2008, Kutzer did
report some anxiety and difficulty concentrating and although he
still had concentration problems on September 12th he denied
anxiety. Id.  Kutzer was continued on psychotropic medications.

On September 19, 2008, Kutzer had an appointment with
Dr. Solgama. Tr. 303-304.  Dr. Solgama's notes of this appointment
are mostly illegible.  Id.  The court can discern that Dr. Solgama
diagnosed Kutzer as suffering from depressive disorder, not
otherwise specified; anxiety disorder, not otherwise specified;
and polysubstance dependence.  Id.  Dr. Solgama also reported that
Kutzer was suffering stress related to his father's medical
treatment for esophageal cancer.  Id.  Dr. Solgama performed a
mental status examination of Kutzer and reported that Kutzer had
no abnormal movements, his mood was "ok," and his affect
appropriate; and he had no auditory or visual hallucinations and
no suicidal or homicidal ideations.  Tr. 303-304.

24

At a therapy appointment at Community Counseling Services on October 9, 2008, Kutzer's mood and affect were described as pleasant and full; his behavior and appearance as cooperative and neat; he was alert and oriented to person, place and time and his thought content clear; he denied suicidal and homicidal ideas; and his insight and judgment were intact. Tr. 364. Kutzer reported some depression related to his father's medical condition. Id.  He denied helpless or hopeless feelings; he reported that he was sleeping well and his appetite was good; and he denied anxiety and mood swings. Id.

On October 24, 2008, Kutzer had an appointment at Community Counseling Services at which he complained of depression, psychotic symptoms, anxiety and sleep problems. Tr. 301. Kutzer reported that he was suffering stress related to his father's medical condition; he was only sleeping 2 to 3 hours per night; and he had low energy during the day. Id.  A mental status examination revealed that he was oriented to person, place and time; his appearance was neat; he had no suicidal or homicidal ideations; his thought process was within normal limits; his speech was normal; he had a full affect; his insight and judgment were fair; and he had good impulse control. Id.  It was reported that he had poor sleep; he had an anxious and irritable mood; and he had paranoia without elaborating thereon. Id.  Kutzer also reported that the Buspar was not helping with his anxiety. Id.

Kutzer was continued on the medications Buspar and Paxil and in addition he was prescribed trazodone.[24] Tr. 276 and 301.

At a therapy appointment at Community Counseling Services on November 6, 2008, Kutzer's mood and affect were described as pleasant and full; his behavior and appearance as cooperative and neat; he was alert and oriented to person, place and time and his thought content clear; he denied suicidal and homicidal ideas; and his insight and judgment were intact. Tr. 363. Kutzer reported increased agitation with taking trazodone. Id. Kutzer denied anxiety, mood swings, depression, drug and alcohol use, auditory and visual hallucinations and reported "he [had] been good." Id. He further stated that his appetite was good and that his sleep is poor without the trazodone. Id. Kutzer was continued on psychotropic medications. Id. However, the trazodone was discontinued and Seroquel[25] added. Id.

Kutzer had an appointment on December 14, 2008, at Community Counseling Services at which he reported that he stopped taking Seroquel because it was making him groggy and recommenced taking trazodone, as needed, which was helping him now. Id. Kutzer

---

24. Trazodone (brand name Oleptro) is an antidepressant medication used to treat major depressive disorder. Trazodone, Drugs.com, http://www.drugs.com/trazodone.html (Last accessed June 13, 2014).

25. Seroquel (generic quetiapine) is an antipsychotic medication used to treat schizophrenia and bipolar disorder as well as used in combination with antidepressant medications to treat major depressive disorder. Seroquel, Drugs.com, http://www.drugs.com /seroquel.html (Last accessed June 13, 2014).

denied depression and anxiety but reported that he could not control his temper. Id. The results of a mental status examination were normal other than it was stated that he had an irritable and anxious mood a few times per week. Id. Kutzer's prescription for Seroquel was discontinued and trazodone added. Id. It was stated that he was sleeping well and that when he has problems sleeping, he "takes trazodone [and] it works." Id.

On January 20, 2009, Kutzer reported that his temper and anger were better controlled and his sleep had improved. Tr. 299. The results of a mental status examination were normal except Kutzer had a flat and anxious affect and he reported seeing lights jumping once per month. Id. Kutzer was continued on trazodone, Buspar and Paxil. Id. Kutzer stated that he was not interested in seeing a therapist. Id.

On February 17, 2009, Kutzer was examined at Community Counseling Services and reported that he was doing better because "his father [was] getting better." Tr. 298. He noted anxiety and stress related to finances and "[every]day issues." Id. The results of a mental status examination were normal except Kutzer reported racing thoughts and paranoia, i.e., thinking people were staring at him. Id. The diagnostic assessment remained the same: depressive disorder, not otherwise specified; anxiety disorder,

not otherwise specified; and polysubstance dependence. Id. Kutzer was prescribed trazodone, Buspar, Paxil and Atarax.[26] Id.

On March 19, 2009, Kutzer was examined at Community Counseling Services and reported that he was not able to fill the prescription for Atarax because of the cost but that he had been taking more Buspar at times. Tr. 296. Kutzer reported depression "sometimes" and anxiety but stated the medications were "definitely help[ing]." Id. The diagnostic assessment remained the same: depressive disorder, not otherwise specified; anxiety disorder, not otherwise specified; and polysubstance dependence. Id. Kutzer was prescribed trazodone, Buspar, Paxil and Atarax. Tr. 276 and 296.

At an appointment on April 16, 2009, Kutzer reported that the medications had helped considerably. Tr. 295.  The results of a mental status examination were essentially normal. Id.  Kutzer did report some irritability. Id.  The diagnostic assessment remained the same: depressive disorder, not otherwise specified; anxiety disorder, not otherwise specified; and polysubstance dependence. Id. Kutzer was prescribed trazodone, Buspar, Paxil and Atarax. Tr. 276 and 295.

On May 21, 2009, Kutzer had an appointment at Community Counseling Services at which time he reported he felt stressed and

---

26.  Atarax or Vistaril (generic hydroxyzine) has antihistamine properties and is used as a sedative to treat anxiety. Atarax, Drugs.com, http://www.drugs.com/atarax.html (Last accessed June 13, 2014).

28

needed his medications. Tr. 292.  A mental status examination revealed that Kutzer's affect and mood appeared depressed and anxious; he reported visual hallucinations, i.e., "shadows []"; his memory and intelligence were noted to be poor; and his judgment and insight poor to fair. Id. However, he was alert and oriented to person, place and time; he had good hygiene, grooming and behavior; and he had a good appetite. Id. Kutzer was continued on the same medications but his dosage of Buspar was increased, Id.

After missing an appointment on June 19, 2009, Kutzer was examined at Community Counseling Services on June 22, 2009. Tr. 290-291.  Kutzer reported that he was doing "ok" but was out of his medications for several days and suffering from stress related to his father's medical condition.  Tr. 290.  It was noted that he was not taking his medications as prescribed. Id.  Kutzer reported that he was sleeping 7-8 hours per night and had a good appetite.  Id.  The results of a mental status examination were essentially normal.  Id.  Kutzer was alert and oriented to person, place and time; he had good hygiene and grooming and appropriate behavior; his affect was full and his mood was euthymic; he had no suicidal or homicidal ideations, no auditory or visual hallucinations, and no obsessions or delusions; his memory, intelligence, insight and judgment were noted to be intact and fair.  Id.  The diagnostic assessment remained the same: depressive disorder, not otherwise specified; anxiety disorder,

29

not otherwise specified; and polysubstance dependence. Id.
Kutzer's prescription for Atarax was discontinued but he was
continued on his other medications. Id. He was advised to take his
medications as directed. Id.

Kutzer's next appointment at Community Counseling
Services was on July 24, 2009.  Tr. 288.  The physician's progress
note of this appointment is partially illegible. Id.  The court
can discern that Kutzer reported that he attended the appointment
to obtain his medications for depression and anxiety. Id.  It was
noted that Kutzer had no history of psychiatric hospitalization;
he was compliant in taking his medications and he had no side
effects; and his sleep and appetite were good. Id. It was further
noted that he had no medical problems and had a history of ecstasy
use. Id. With regard to mental status findings he had no suicidal
or homicidal ideations; he reported depression and anxiety;  he
was oriented and his hygiene, grooming, behavior, intelligence and
memory were "ok." Id.  Kutzer was prescribed the medications Paxil
and Buspar. Tr. 275.

Kutzer returned to Community Counseling Services on
August 25, 2009, at which time he reported that he was doing "ok"
and had no problems. Tr. 287.  Kutzer stated that his sleep was
fair and his appetite good. Id.  Kutzer noted that when he has a
problem sleeping he takes trazodone. Id.  The results of a mental
status examination were essentially normal. Id.  Kutzer did report
racing thoughts and some "anxiety." Id.  The diagnostic assessment

30

remained the same: depressive disorder, not otherwise specified;
anxiety disorder, not otherwise specified; and polysubstance
dependence. Id.  Kutzer was prescribed the medications Paxil,
Buspar and trazodone. Id.

Kutzer had appointments at Community Counseling Services
on September 22, October 20 and December 9, 2009. Tr. 283, 286 and
360.

On September 22nd Kutzer reported that he "just lost
[his] job" and that he felt he "was wrongfully terminated." Tr.
286. He stated that the Paxil and Buspar were "really" helping.
Id.  The results of a mental status examination were normal other
than his mood was described as depressed, anxious, irritable and
angry and he had racing thoughts and his judgment and insight were
diminished. Id.  The cause of his anger and irritability was noted
to be the loss of his job. Id.  The diagnostic assessment remained
the same: depressive disorder, not otherwise specified; anxiety
disorder, not otherwise specified; and polysubstance dependence.
Id.  Kutzer was prescribed the medications Paxil, Buspar and
trazodone. Tr. 275.

At the appointment on October 20th Kutzer's mood and
affect were described as bright, his behavior and appearance as
controlled and well kept and his insight and judgment as good. Tr.
360. He was oriented to person, place and time and he denied
suicidal and homicidal ideations. Id.  Kutzer stated that his
medications were helping, that he was sleeping well with the

trazodone and he recently started a new job. Id.  Kutzer was prescribed the medications Paxil, Buspar and trazodone. Id.

On December 9th Kutzer complained of anxiety, racing thoughts and depression after he had been off his medication for 1 ½ weeks. Tr. 283. He had not been compliant with his medications because he had been taking up to six Buspar per day and ran out of his medication. Id.  Despite his noncompliance, Kutzer reported that he was sleeping "ok" and had a good appetite. Id.  A mental status examination revealed that Kutzer was alert and oriented to person, place and time; his hygiene and grooming were described as good; his behavior was described as appropriate; he had normal speech and motor activity with no abnormal movements; his affect was full; Kutzer reported anxiety, occasional depression, racing thoughts and no motivation; he denied suicidal and homicidal ideations and auditory and visual hallucinations; and his memory was intact and his intelligence described as average and his insight and judgment as fair. Id.  The diagnostic assessment remained the same: depressive disorder, not otherwise specified; anxiety disorder, not otherwise specified; and polysubstance dependence. Id.  Kutzer was continued on the medications Paxil and trazodone. Id. However, Buspar was discontinued and in its place he was prescribed Vistaril for anxiety. Id.

On January 6, 2010, Kutzer reported that he was doing "good," "feeling much better" and that the Vistaril was helping with his anxiety. Tr. 282. The results of a mental status

32

examination were completely normal. Id.  Kutzer was alert and
oriented to person, place and time; his hygiene and grooming were
described as appropriate; his behavior was described as
cooperative; his speech and motor activity were described as clear
and coherent; his affect was described as full and his mood as
euthymic; his memory and intelligence were described as intact and
average; and his insight and judgment were described as fair. Id.
Kutzer denied depression, racing thoughts, auditory and visual
hallucinations, delusions and paranoia. Id.  With regard to his
anxiety he stated that it was "much less since starting Vistaril."
Id. The diagnostic assessment remained the same: depressive
disorder, not otherwise specified; anxiety disorder, not otherwise
specified; and polysubstance dependence. Id.  Kutzer was continued
on the medications Paxil, trazodone and Vistaril. Id.

Kutzer had two appointments at Community Counseling
Services in February, 2010, prior to his father passing on
February 25, 2010. Tr. 278 and 280. The records of these two
appointments which occurred on February 9th and 23rd reveal that
Kutzer suffered from situational anxiety and stress because of his
father's declining health. Id.  Kutzer's mood was irritable, he
had racing thoughts and mood swings, but he was alert, oriented,
well groomed, with no abnormal behavior; he had normal speech and
motor activity; his affect was full and he had no hallucinations,
delusions or suicidal or homicidal ideations; his memory and
intelligence were described as intact and average; and his insight

33

and judgment were described as fair. Id. On February 9th Kutzer's dosage of Vistaril was increased and in addition to Paxil and trazodone he was prescribed Zyprexa.[27] Tr. 275 and 280. On February 23rd his dosage of Vistaril was again increased. Tr. 278. On both occasions the diagnostic assessment remained the same: depressive disorder, not otherwise specified; anxiety disorder, not otherwise specified; and polysubstance dependence. Tr. 278 and 280.

At an appointment on March 9, 2010, after his father passed away, Kutzer's mood was depressed, he had no motivation and the number of hours he slept increased. Tr. 359. However, his behavior was described as cooperative, his appearance as neat, his insight and judgment as adequate and he was talkative with clear thought content. Id. Furthermore, Kutzer denied any suicidal or homicidal ideations. Id. Kutzer also reported that he had a job but that it did not work out because it involved "too much lifting." Id. There were adjustments made to Kutzer's medication regimen. Tr. 274 and 359. His dosage of Paxil was increased but the dosage of Vistaril was decreased and he was continued on trazodone and Zyprexa. Id.

During the spring and summer of 2010, Kutzer had problems with his family relating to the settlement of his

---

27. Zyprexa (generic name olanzapine) is an antipsychotic medication which is used to treat psychotic conditions, including those associated with bipolar disorder. Zyprexa, Drugs.com, http://www.drugs.com/zyprexa.html (June 13, 2014). It may also be used to treat other condition not specified in the medication guide. Id.

father's estate which caused stress and anxiety. Tr. 254, 354 and 356-357.  However, he reported that his medications were working "fairly well." Tr. 357. His mood was good with a full affect, cooperative behavior, neat appearance, and clear thought process. Tr. 356-357. He had no suicidal or homicidal ideations and his insight and judgment were described as adequate or fair. Id.  The diagnostic assessment during this period of time remained the same: depressive disorder, not otherwise specified; anxiety disorder, not otherwise specified; and polysubstance dependence. Tr. 254.  A treating medical provider at Community Counseling Services on May 17, 2010, gave Kutzer a GAF score of 54, representing moderate symptoms which assessment was reviewed and approved by C. Chang, M.D., a treating psychiatrist, on June 15, 2010. Id.

On October 18, 2010, Kutzer had an appointment at Community Counseling Services at which time he reported that he was "feeling better," "eating and sleeping 'ok,'" and had "no other complaints." Tr. 354. His mood and affect were described as good and full; his behavior and appearance as cooperative and neat; his flow of thought and thought content as talkative and alert and oriented to person, place and time; and his insight and judgment as fair. Id.  Kutzer also denied any suicidal or homicidal ideations. Id.  Kutzer was continued on the medications Paxil, Zyprexa, trazodone and Vistaril. Id.

35

On December 9, 2010, Kutzer was evaluated by Sara J. Cornell, Psy.D., a licensed psychologist, on behalf of the Bureau of Disability Determination. Tr. 314-319.  After conducting a clinical interview and a mental status examination, Dr. Cornell concluded that Kutzer suffered from a learning disorder, not otherwise specified; bipolar disorder, most recent episode depressed, severe with psychotic features; generalized anxiety disorder; and panic disorder with agoraphobia. Tr. 319.  Dr. Cornell gave Kutzer a current GAF score of 40. Id.  Dr. Cornell's report of the evaluation does not reveal that she reviewed Kutzer's medical records. Tr. 317-319. The report contains Dr. Cornell's immediate observations of Kutzer, a summary of what Kutzer reported during the clinical interview and one paragraph outlining the results of the mental status examination. Id.  Dr. Cornell did observe that Kutzer interacted appropriately with her and provided a detailed history and description of his current functioning and mental status. Tr. 317. She observed that he was poorly dressed and groomed but had fair hygiene; he was polite, pleasant, and cooperative; he was alert and oriented to person, place and time; his affect was flat and his mood depressed; his speech was spontaneous, clear, coherent and logical, with no evidence of formal thought disorder; his speech was of an appropriate volume; his thought process was relevant and goal-directed; he exhibited fair attention and concentration; he appeared to have minimal judgment and insight into his

difficulties; and he appeared to have average intellectual ability. Id.  It was noted that Kutzer cried throughout the interview and had significant difficulty composing himself. Id. The paragraph containing the results of the mental status examination states in toto as follows:

> David's gait, posture and general movements are unremarkable. He has fair eye contact and fair social skills. David exhibits no tics, repetitive, stereotypical, or odd movements. He denies any hallucinations, but states he sees shadows and occasionally hears voices. He denies delusions, or bizarre behaviors. David has difficulty providing examples as to the likely outcomes of his behaviors or what he would do in various imaginary situations. He cannot perform test of counting and seriation, such as counting backward from 100 by 7s.

Tr. 319. Dr. Cornell also completed a statement of Kutzer's work-related functional abilities. Tr. 314-315. Dr. Cornell found that Kutzer had moderate limitations in his ability to make judgments on simple work-related decisions and interact appropriately with the public, supervisors and co-workers; and marked limitations in his ability to respond appropriately to work pressures in the usual work setting and changes in a routine work setting. Tr. 314. Dr. Cornell specifically noted that her mental functional assessment was only based on Kutzer's statements during the interview and her one-time clinical evaluation. Tr. 314-315.

On January 10, 2011, Kutzer had an appointment at Community Counseling Services with Dustin Hobbs, a certified physicians assistant, at which time Kutzer reported "doing well [with] no new complaints." Tr. 353. A mental status examination

revealed that Kutzer was alert and oriented to person, place and time; his hygiene and grooming were described as neat and his behavior as cooperative; his speech and motor activity was described as within normal limits; his affect as full and his mood as good; his memory and intelligence as intact and average; and his insight and judgment as fair. Id.  Kutzer denied suicidal and homicidal ideations, hallucinations, delusions, obsessions, and thought and perceptual disturbances. Id.  The diagnostic assessment remained the same except it stated that he had a history of polysubstance dependence. Id. Kutzer was continued on the medications Paxil, Zyprexa, trazodone and Vistaril. Tr. 345 and 353.

On January 19, 2011, Peter Garito, Ph.D., a psychologist, reviewed on behalf of the Bureau of Disability Determination, Kutzer's medical records, including Dr. Cornell's report, and found that Kutzer suffered from a learning disorder, bipolar disorder, panic disorder with agoraphobia, generalized anxiety disorder, and polysubstance abuse by history,  but that those conditions did not meet or equal the requirements of a listed impairment. Tr. 324-337.  Dr. Garito found that Kutzer was either not substantially limited, or only moderately limited, in all categories of workplace functioning. Tr. 320-321. Dr. Garito noted that Kutzer lived alone and was independent in his lifestyle. Tr. 322.  Kutzer performed all of his own activities of daily living, including driving and shopping, and he was in

38

contact with others although he preferred to stay by himself. Id. Dr. Garito further stated that Dr. Cornell's assessment was based on an isolated examination and was an overestimate of the severity of Kutzer's limitations. Tr. 323. Dr. Garito stated that Kutzer had the ability to perform simple, routine tasks in a work-type setting; his basic memory processes are intact; he can make simple decisions and carry out very short and simple instructions; he has the ability to maintain regular attendance and be punctual; he has adequate impulse control; he is able to get along with others in a workplace without distracting them; he has no restrictions in his abilities with regards to understanding and memory; and he can function in a production oriented job requiring little independent decision making. Tr. 322.  Dr. Garito concluded that Kutzer was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment." Tr. 323.

On February 22, 2011, physician assistant Hobbs completed a "Pennsylvania Department of Public Welfare, Employability Re-Assessment Form" on behalf of Kutzer. Tr. 342-343. Mr. Hobbs stated in a conclusory fashion without specifying any work-related functional abilities that Kutzer was temporarily disabled for less than 12 months from February 22, 2011, until August 22, 2011.[28] Tr. 343.

---

28.  Mr. Hobbs provided a handwritten answer to the question which may in fact be June 22, 2011.  However, we have given
(continued...)

On March 29, June 3 and 24, July 11, August 8 and October 3, 2011, Kutzer attended appointments at Community Counseling Services. Tr. 346-349 and 351-352.  The notes of these appointments reveal that Kutzer had occasional anxiety or panic attacks.  Id.

On March 29th Kutzer was distraught because he "just lost his [medical assistance]" and "was worried about not being able to afford his [medications]." Tr. 352.  However, on that date the results of a mental status examination were essentially normal and at the next appointment on June 3rd Kutzer reported that he was "much calmer." Tr. 351 He further stated that "his anxiety is being controlled" and his depression was "ok." Id.

On June 24th Kutzer reported an increase in anxiety and that he felt stressed. Tr. 349. However, the results of a mental status examination were essentially normal. Id. Kutzer was alert and oriented to person, place and time; his hygiene, grooming and behavior were appropriate; his affect was full and his mood normal; he had no hallucinations, delusions or obsessions; he had no suicidal or homicidal ideations; and his memory, intelligence, insight and judgment were intact. Id.  Furthermore, the individual performing the mental status examination noted that there was "no visual evidence of anxiety" during the visit. Id.

---

28.  (...continued)
Kutzer the benefit of the doubt.

At the appointment on July 11th Kutzer reported that he was "having difficulty on food stamps" and was anxious. Tr. 348. A mental status examination, however, revealed he was oriented; his hygiene, grooming and behavior were "ok" and his speech and motor activity relevant; he denied hallucinations and delusions; and his memory and intelligence were "ok." Id.

On August 8th Kutzer reported poor sleep and that he felt overwhelmed and unmotivated but he admitted that he stopped taking his medications. Tr. 347. Kutzer denied suicidal or homicidal ideations; he was oriented to person, place and time; his hygiene, grooming and behavior were appropriate; his thoughts were organized and he denied hallucinations, delusions and obsessions; and his memory, intelligence, insight and judgment were fair. Id.

On October 3rd Kutzer denied depression, was well groomed, fully oriented, and had no abnormal movements. Tr. 346. Kutzer's speech was within normal limits, his mood pleasant, his thought process was clear, and he denied hallucinations. Id. Kutzer reported that he used to have thoughts of hurting others, but not anymore. Id. His memory was good, his intellectual functioning was average, and his insight and judgment fair. Id. The diagnostic assessment was depressive disorder, not otherwise specified; anxiety disorder, not otherwise specified; and polysubstance dependence. Id. He was given a GAF score of between 50 and 61. Id.

No treating physician, psychiatrist or other medical provider provided a work-related mental functional assessment indicating that Kutzer was mentally disabled for the requisite 12 continuous months.

**Discussion**

The administrative law judge at step one found that Kutzer had not engaged in any substantial gainful activity since September 2, 2007, the alleged onset date set forth in Kutzer's applications. Tr. 82, 135 and 137.

At step two of the sequential evaluation process, the administrative law judge found that Kutzer had the following severe impairments: "learning disorder, bipolar disorder-not otherwise specified, generalized anxiety disorder, panic disorder and polysubstance abuse-reported in remission[.]" Tr. 83.

At step three of the sequential evaluation process the administrative law judge found that Kutzer's impairments did not individually or in combination meet or equal a listed impairment. Id.  In so doing the administrative law judge reviewed the mental health Listing 12.02, 12.04, 12.06 and 12.09, and relying on the opinion of Dr. Garito, found that Kutzer had mild restrictions of activities of daily living, moderate difficulties of social functioning, moderate difficulties of concentration, persistence and pace, and no episodes of decompensation of an extended duration. Tr. 83-84.  The administrative law judge further indicated that her assessment of those factors was not a residual

42

functional capacity assessment and was only with respect to the
severity of the mental impairments at steps 2 and 3 of the
sequential evaluation process and that her assessment of Kutzer's
residual functional capacity at step four of the sequential
evaluation process would be more detailed and reflect Kutzer's
limitations in activities of daily living, social functioning and
concentration, persistence and pace.

   At step four of the sequential evaluation process the
administrative law judge found that Kutzer had the residual
functional capacity to perform the full range of work at all
exertional levels but with several nonexertional limitations. Tr.
84. Specifically, the administrative law judge found that Kutzer
was

> limited to occupations requiring no more than simple,
> routine tasks, not performed in a fast-paced production
> environment, involving only simple, work-related
> decisions, and in general, relatively few work place
> changes. [Kutzer] would be limited to occupations []
> which require low stress, defined as occasional
> decision making required and occasional changes in
> work setting. [Kutzer] would be limited to occupations
> which require no prolonged reading for content and
> comprehension or complex mathematical calculations
> such as cashier or teller work. [Kutzer] would be
> limited to occupations [] which require no more than
> occasional interaction with supervisors and co-workers,
> no tandem tasks with co-workers and no interaction with
> members of the general public, but can be in proximity
> to the public.

Tr. 84.  In setting this residual functional capacity, the
administrative law judge considered Kutzer's credibility, past
work and his activities of daily living, and the records of the
treating mental health providers.  Tr. 82-86 and 88.  The

administrative law judge further noted the "contradiction" in Kutzer, when applying for unemployment compensation benefits, "certifying" that he was "ready, willing and able to work" and then claiming during the same time frame that he was disabled. Tr. 83.  The administrative law judge found that Kutzer's statements concerning the intensity, persistence and limiting effects of his impairments were not credible to the extent that they were inconsistent with his ability to engage in the work as described above. Tr. 88.  The administrative law judge also considered the opinions of Mr. Hobbs, Dr. Cornell and Dr. Garito. Tr. 85-87. The administrative law judge rejected the conclusory disability opinion of Mr. Hobbs and the opinion of Dr. Cornell that Kutzer had some marked mental work-related functional limitations and a GAF score of 40. Tr. 86.  Instead, the administrative law judge placed great weight on the assessment of Dr. Garito who found that Kutzer only had a few moderate mental functional limitations and had the ability to engage in sustained full-time employment despite his mental limitations. Tr. 87.

Based on the above residual functional capacity and the testimony of a vocational expert, the administrative law judge found at step four that Kutzer could perform his prior unskilled, medium work as a packer. Tr. 89.  In addition and in the alternative, the administrative law judge at step five of the sequential evaluation process found that Kutzer could perform unskilled, medium work as a groundskeeper; unskilled, light work

as a picker/packer/sorter; and unskilled, sedentary work as an
inspector of small products. Tr. 89-90.  The administrative law
judge further found that there were a significant number of such
jobs in the regional and national economies. Tr. 90.

The administrative record in this case is 367 pages in
length, primarily consisting of vocational and mental health
records.  The administrative law judge did an adequate job of
reviewing Kutzer's medical history and vocational background in
her decision. Tr. 80-90.  Furthermore, the brief submitted by the
Commissioner sufficiently reviews the medical and vocational
evidence in this case. Doc. 13, Brief of Defendant.

Kutzer argues that the administrative law judge erred by
(1) failing to account for all of Kutzer's credibly established
limitations, particularly his moderate limitation in
concentration, persistence and pace; (2)failing to appropriately
evaluate Kutzer's credibility; and (3) failing to evaluate
properly Kutzer's receipt of unemployment compensation benefits.
We have thoroughly reviewed the record in this case and find no
merit in Kutzer's arguments.

The primary issue is whether or not substantial evidence
supports the administrative law judge's decision that Kutzer had
the mental ability to engage in unskilled work.  No treating
psychiatrist or other mental health professional submitted a
functional assessment of Kutzer which indicated that he was
functionally impaired from a mental standpoint for the requisite

45

continuous 12 month period.[29]  However, the record does contain an

assessment from a psychologist, Dr. Garito, which supports the

administrative law judge's decision.

As part of the step three analysis, the administrative

law judge found that Kutzer had moderate difficulties with

concentration, persistence and pace.  However, when presenting a

hypothetical question to the vocational expert, the administrative

law judge did not include a moderate limitation in concentration,

persistence and pace.  Courts in this circuit and other circuits

have held that if an administrative law judge poses a hypothetical

question to a vocational expert that fails to reflect all of the

applicant's impairments that are supported by the record, the

vocational expert's opinion cannot be considered substantial

evidence. Ramirez v. Barnhart, 373 F.3d 546, 552-553 (3d Cir.

2004);[30] O'Connor-Spinner v. Astrue, 627 F.3d 614, 620 (7th Cir.

2010); Stewart v. Astrue, Civil No. 11-00978, 2012 WL 6538516, at

---

29.  To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

30.  In Ramirez the Commissioner argued that the finding of a
moderate limitation in concentration, persistence and pace at
step three was not a residual functional capacity finding and was
not applicable to steps 4 and 5 and need not be included in a
hypothetical question to the vocation expert. The Court of
Appeals rejected this argument stating that although the moderate
limitation at step 3 was not the RFC assessment it did not follow
that the finding played no role in steps 4 and 5. 372 F.3d at
555.

*6 (M.D. Pa. 2012)(Caputo, J.); <u>see</u> <u>also</u> <u>Corona v. Barnhart</u>, 431
F.Supp.2d 506, 516 (E.D.Pa. 2006)("the ALJ's determination that
Plaintiff suffers mild restrictions in activities of daily living,
moderate difficulties in maintaining social functioning and
moderate difficulties in maintaining concentration is not properly
reflected in her hypothetical question to the VE."); <u>Warfle v.</u>
<u>Astrue</u>, Civil No. 10-1255, slip op. at 20 (M.D. Pa. May 5,
2011)(Muir, J.)("It is incumbent on the administrative law judge
to include in a hypothetical question all the limitations that are
supported by the records."); <u>Little v. Astrue</u>, Civil No. 10-1626,
slip op. at 18-19 (M.D.Pa. September 14, 2011)(Kosik, J.)(same).

    Kutzer contends that the administrative law judge in
phrasing a hypothetical question for the vocational expert did not
sufficiently account for Kutzer's moderate limitations in
concentration, persistence and pace.  A residual functional
capacity  merely for unskilled or simple work may not account for
moderate limitations in concentration, persistence or pace if
those factors are not specifically delved into with the vocational
expert. However, in the present case, in contrast to <u>Ramirez</u>,
<u>O'Connor-Spinner</u> and <u>Stewart</u> and other cases from this district,
the administrative law judge included numerous other limitations
beyond simple or unskilled work. Tr. 83-84. The administrative law
judge limited Kutzer to:

    <u>occupations requiring nor more than simple,</u>
    <u>routine tasks, not performed in a fast-paced production</u>
    <u>environment, involving only simple, work-related</u>
    <u>decisions, and in general, relatively few work place</u>

> changes. [Kutzer] would be limited to occupations []
> which require low stress, defined as occasional
> decision making required and occasional changes in
> work setting. [Kutzer] would be limited to occupations
> which require no prolonged reading for content and
> comprehension or complex mathematical calculations
> such as cashier or teller work. [Kutzer] would be
> limited to occupation [] which require no more than
> occasional interaction with supervisors and co-workers,
> no tandem tasks with co-workers and no interaction with
> members of the general public, but can be in proximity
> to the public.

Tr. 84 (emphasis added).  This residual functional capacity was

encompassed within the hypothetical question asked of the

vocational expert. Tr. 68-69.

Another item of importance with respect to Kutzer's

first argument is the fact that Dr. Garito completed a mental

functional capacity form (a Psychiatric Review Technique form)

noting with respect to the severity of Kutzer's mental impairments

at step 3 of the sequential evaluation process that Kutzer had

moderate limitations in maintaining concentration, persistence and

pace but he also went on and concluded in part III of the form

that Kutzer was able to meet the basic mental demands of

competitive work on sustained basis. Tr. 322-336.  With respect to

that form, the Social Security Program Operation Manual System

(POMS) defines "moderately limited" as "when the evidence supports

the conclusion that the individual's capacity to perform the

activity is impaired" without specifying the degree of impairment

and the degree of limitations/impairment has to be specified in

Section III of the form.  The administrative law judge adopted the

assessment of Dr. Garito set forth in section III of that form,

i.e., that Kutzer could engage in competitive work on a sustained
basis despite his limitations. Tr. 323.  This fact is evidenced by
the administrative law judge's statement in her decision that her
assessment of those factors (including concentration, persistence
and pace) was not a residual functional capacity assessment and
was only with respect to the severity of the mental impairments at
steps 2 and 3 of the sequential evaluation process and that her
assessment of Kutzer's residual functional capacity at step four
of the sequential evaluation process would be more detailed and
reflect Kutzer's limitations in those areas.

      Merely, limiting Kutzer to unskilled work involving
simple, routine tasks, would not have adequately reflected a
limitation in concentration, persistence and pace. Id.  There are
clearly many unskilled work environments which require an employee
to maintain concentration, persistence and pace, such as fast-
paced production environment.  However, the administrative law
judge limited Kutzer to jobs that were not performed in such an
environment.  The court is satisfied that the administrative law
judge appropriately addressed Kutzer's moderate limitation in
concentration, persistence and pace in the hypothetical question
asked of the vocational expert and in her decision.

      To the extent that Kutzer argues that the administrative
law judge did not properly consider his credibility, the
administrative law judge was not required to accept Kutzer's
claims regarding his mental impairments. See Van Horn v.

49

Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ."  Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Here, Kutzer's moderate examination findings, improvement with treatment, and daily activities as extensively reviewed in this memorandum provide substantial evidence to support the administrative law judge's credibility determination. Because the administrative law judge observed and heard Kutzer testify, the administrative law judge is the one best suited to assess his credibility.[31]

---

31.  Kutzer also argues that the administrative law judge inappropriately assessed the credibility of his mother and friend.  The court finds no merit in that argument in light of the entire record. The administrative law judge discussed the assertions of Kutzer's mother and best friend, including that he lacked focus, had difficulty getting along with others, isolated himself, was depressed, and needed help with tasks. Tr. 85. The administrative law judge then discussed the contrary medical evidence. Id.  Under the circumstances the court is satisfied that the ALJ appropriately considered the third-party statements.

(continued...)

As for Kutzer's claim that the administrative law judge erred in considering his application for and receipt of unemployment compensation benefits, this court has repeatedly indicated that it is appropriate for an administrative law judge to consider such conduct when judging the credibility of an individual applying for social security disability benefits. See, e.g., Root v. Colvin, Civil No. 13-655, slip op. at 6 & n.7 (M.D.Pa. March 31, 2014)(Rambo, J.); Frame v. Colvin, Civil No. 11-2275, slip op. at 8 & n.10 (M.D.Pa. July 8, 2013)(Caldwell, J.); Woodcock v. Astrue, Civil No. 11-700, slip op. at 7 & n.11 (M.D.Pa. Sept. 17, 2012)(Nealon, J.); Obara v. Astrue, Civil No. 10-2579, slip op. at 3 & n.3 (M.D.Pa. Dec. 28, 2011)(Nealon, J.). A person who received unemployment compensation has to represent that he is ready, willing and able to accept employment. Applying for disability insurance benefits is inconsistent with that representation and it is clearly appropriate for an ALJ to consider it in judging an applicant's credibility.  Kutzer's reliance on a 1996 internal agency memorandum by Regional Chief Judge Frank A. Cristaudo regarding unemployment compensation, attached to Kutzer's brief, in no way changes the appropriateness of considering such inconsistency. See, e.g., Turner v. Colvin,

---

31.  (...continued)
See, e.g., Pailin v. Colvin, Civil No. 10-4556, 2013 WL 5954972, at *5-6 (E.D.Pa. Nov. 5, 2013)(finding that the ALJ properly considered family member's statements where the ALJ discussed the statements, which were repetitive of the claimant's own statements, and discussed the evidence on the claimant's credibility).

Civil No. 12-2648, 2013 WL 5574920, at *4 (N.D. Ala. Oct. 10, 2013)("The ALJ's conclusion that the receipt of unemployment benefits is a factor undermining Plaintiff's credibility is consistent with the Cristaudo memorandum and the great weight of authority.").

 Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

 An appropriate order follows.


    s/ Yvette Kane
   Yvette Kane
   United States District Judge


Date: September 26, 2014